**UNITED STATES of America,**
**Appellee,**

v.

**Lester STRAUGHAN, Appellant.**

**No. 71–1189.**

United States Court of Appeals,
Eighth Circuit.

Jan. 12, 1972.

Mortimer A. Rosecan, Rosecan & Popkin, St. Louis, Mo., for appellant.

John J. Robinson, Roger A. Pauley, Attys., Department of Justice, Washington, D. C., Daniel Bartlett, Jr., U. S. Atty., Harry L. Strachan, III, Sp. Atty., Dept. of Justice, St. Louis, Mo., for appellee.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

The defendant was convicted by a jury for having received, concealed, stored and sold a stolen Case 580 tractor in violation of the Dyer Act, 18 U.S.C. § 2313.[1]

---

1. The defendant was first indicted on four counts on June 20, 1970. On October 29, 1970, the government substituted a new five-count indictment. Counts I and II were for Dyer Act violations. Count III charged the defendant with obstruct- ing the communication of information to the F.B.I. in violation of 18 U.S.C. § 1510. Count IV charged him with endeavoring to influence testimony before a grand jury in violation of 18 U.S.C. § 1503, and Count V charged the de-

On appeal, the defendant contends (1) that the tractor is not a "motor vehicle" within the meaning of the Dyer Act; (2) that he was prejudiced by the improper admission of evidence concerning his character; and (3) that he was prejudiced by the improper admission of evidence concerning his refusal to give a handwriting exemplar.

■ We find that the tractor is a motor vehicle within the meaning of the Dyer Act, but hold that the defendant was prejudiced by the improperly admitted character evidence. We do not reach the third contention.

The Case 580 tractor has been characterized by the defendant as construction equipment. He argues that such machines are not "motor vehicles." The Dyer Act definition of "motor vehicle," however, " * * * includes an automobile, automobile truck, automobile wagon, motorcycle, or *any other self-propelled vehicle designed for running on land but not on rails.*" (Emphasis added.) 18 U.S.C. § 2311. We think that the emphasized language is broad enough to include the Case 580 tractor. See, United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); United States v. Jones, 421 F.2d 175 (5th Cir. 1970). In *McGlamory*, the Court held that a bulldozer was a motor vehicle within the meaning of the Act. It reasoned that:

" * * * 'Motor vehicle' is after all merely a descriptive or generic term. The only qualifications placed upon this machine by the definition of § 2311 is that the motor vehicle must be capable of traveling on land but not on rails. Neither § 2311 nor [another statute not applicable here] contain the requirement that a vehicle must be used for transportation of passengers or that the motor vehicle must operate on the highways. * * * "

441 F.2d at 133.

While the term "motor vehicle" is not wholly free of ambiguity, the inclusion of the Case 580 tractor within its ambit comports with the literal construction of the term. *Cf.,* McBoyle v. United States, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816 (1931).

The defendant's contention that he was prejudiced by the improper admission of character evidence must be viewed in the light of the only factual issue in dispute at the trial. The defense position was that the defendant did not know the tractor was stolen. Evidence was produced to explain the defendant's possession of the tractor. A number of character witnesses testified to the defendant's good reputation for honesty. The government in rebuttal called a state police officer for the sole purpose of testifying about the defendant's reputation for "honesty, integrity, and being a law abiding citizen." The testimony of that witness and his cross-examination were as follows:

"Q. [by Mr. Strachan, U. S. Attorney] Do you know the accused in this case, the defendant?

\* \* \* \* \* . \*

"Q. How long have you known him? A. About twelve years.

"Q. Are you acquainted with the people in the Farmington area that know Lester Straughan? A. Yes, Sir.

"Q. Are you acquainted with his reputation in that area and among those people who know him for integrity and honesty and being a law-abiding citizen? \* \* \*

"\* \* \* A. Well, actually he has two reputations.

"Q. You say two reputations? Would you give us—we will take the aspect of one of those reputations for integrity, honesty and being a law-abiding citizen, what is that reputation? A. Good. He is well thought of.

---

fendant with offering a witness something of value in violation of 18 U.S.C. § 201 (h).

Before the trial, the government dismissed the fifth count. During the trial, it dismissed Count III. Thus, the case was submitted to the jury on Counts I, II and IV. The jury found the defendant innocent on Counts II and IV, and guilty on Count I.

"Q. How about the other reputation for honesty, integrity and being a law-abiding citizen? A. This I would clarify. In the community that I work in in law enforcement I would say it is bad.

\* \* \* \* \* \*

"Mr. Rosecan: If the Court please—

"Come on up, counsel.

"(Thereupon, the following occurred at the bench out of the hearing of the jury:)

"Mr. Rosecan: If the Court please, the Government has done just exactly what they objected when they thought that this is what we were doing. They said the reputation has to be confined to a man's reputation in the area in which he lived. They showed that now and he said he had a good reputation. Then he asked another question and he answered, in law enforcement circles it is bad. That is not the test of whether a reputation is good or bad or not. It is highly prejudicial and I must move for a mistrial at this time. \* \* \*

\* \* \* \* \* \*

"The Court: The motion is overruled. Let's go.

"Mr. Rosecan: May I ask that the jury be instructed to disregard that?

"The Court: No, sir.

\* \* \* \* \* \*

"Q. [by Mr. Rosecan, defense counsel] What did you mean by law enforcement? A. Different agencies from out of the county, people from southeast Missouri, people from St. Louis City, St. Louis County.

\* \* \* \* \* \*

"Q. But these people who told you bad things about Lester Straughan don't come from his home county where he lived, they come from southeast Missouri and other places? A. Other communities, yes, sir.

\* \* \* \* \* \*

"Q. You mentioned southeast Missouri as the place where he is supposed not to have such a good reputation. Didn't you say— A. (Interrupting) No, sir, I didn't say his reputation had been discussed from those people. I said people in other agencies in southeast Missouri have called on me to make checks in reference to him.

"Q. Make checks in reference to him? A. Yes, sir.

"Q. Were you called upon by other agencies to make checks with reference to him? A. Yes, sir.

"Q. And all the checks that you have made with reference to him did you find out he had committed any crime when you checked him? A. No, sir.

"Q. Did you find out he had not committed any crime when you checked him? A. I didn't find out either way. I merely made the check and forwarded the information back to the people who required it.

"Q. Well, you made a check on him and you found out—if you found out he had committed a crime you would know that, wouldn't you? A. It wasn't with reference—As far as I knew it wasn't with reference to a crime.

"Q. It wasn't with reference to a crime? What would you be checking him for? A. Serial numbers on various pieces of equipment that were heavy construction equipment around in the Lead Belt area on construction jobs. They would ask me to go out and make a check on the serial number, which I did for the Highway Patrol in Poplar Bluff, and I have done it for a police agency up here in St. Louis County.

\* \* \* \* \* \*

"Q. (By Mr. Rosecan) When you talked about his reputation among law enforcement people, was that as a result of your being called upon to check him out on certain things? A. Yes, sir.

"Q. And that is how you formulated your opinion was because you had been asked to check him out.? A. Yes, sir.

"Q. I see. And you did check him out, is that right? A. Yes, sir.

\* \* \* \* \* \*

"Mr. Rosecan: If the Court please, I at this time move that the testimony of this

witness as to the reputation of Lester Straughan that he got from the law enforcement people in southeast Missouri, St. Louis and St. Louis County be stricken and the jury instructed to disregard it because there is no sufficient basis upon which to formulate an opinion concerning Lester Straughan's reputation as a good character.

"The Court: Overruled."

█ █ The government now concedes that "[although [the defendant] had put his character in issue by introducing testimony by several witnesses as to his good reputation in the community * * *, evidence in a group other than the community where he lived or worked was not proper rebuttal."[2] The government argues, however, that the error in admitting this improper character evidence was harmless. We do not agree.

In determining whether or not this error was harmless, we are guided by the standard laid down by the Supreme Court in Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946):

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand * * *. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. * * * *"

Here, we cannot say with assurance that the jury was not substantially swayed by the admission of the improper character testimony.[3]

---

2. See, Williams v. United States, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509 (1897), cited with approval in Michelson v. United States, 335 U.S. 469, 480, n. 17, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Burns v. State, 23 Tex.App. 641, 5 S.W. 140 (1887); People v. Markham, 64 Cal. 157, 30 P. 620 (Cal.1883). But compare, 5 Wigmore on Evidence, 3rd Ed., § 1616, n. 2. In *Williams* the Supreme Court wrote:

 " * * * Assuming (although the record is silent on the subject) that the accused introduced evidence of his general reputation for integrity, it is clear that evidence, on behalf of the prosecution, that among the limited number of people employed in a particular public building his character was bad, was inadmissible. The prosecution should have been restricted to such proof touching the character of the accused as indicated his general reputation in the community in which he resided, as distinguished from his reputation among a few persons in a particular building. The estimate placed upon his character by the community generally could not be shown by proof only as to the estimate placed upon him by persons in the custom house."

 *Id.* at 168 U.S. 397, 18 S.Ct. at 97, 98.

 Here, the improper testimony did not even have a sound basis. The law en-

forcement community of which the officer spoke included not only law enforcement personnel in " * * * southeast Missouri but in St. Louis, St. Louis County and in other areas." Thus, the defendant's reputation in this particular law enforcement community was not based on continuous personal observation, which is indispensable as a foundation for ascertaining reputation. See, 5 Wigmore on Evidence, 3rd Ed., § 1615.

3. We have recognized that improper testimony relating to the character of the accused is particularly likely to damage his case. United States v. Crawford, 438 F.2d 441 (8th Cir. 1971); Echert v. United States, 188 F.2d 336, 342 (8th Cir. 1951); Little v. United States, 93 F.2d 401, 408 (8th Cir. 1937), cert. denied, 303 U.S. 644, 58 S.Ct. 643, 82 L.Ed. 1105 (1938). See also, Osborne v. United States, 351 F.2d 111, 118 (8th Cir. 1965); United States v. Pennix, 313 F.2d 524 (4th Cir. 1963). Ordinarily, once the government has elicited improper character testimony, it should not " * * * be heard to say that the methods which were used did not have the effect which they were obviously intended to have. * * * *" Salerno v. United States, 61 F.2d 419, 424 (8th Cir. 1932).

The officer's improper character testimony had three effects: (1) it obviously undercut the testimony of the defendant's character witnesses; (2) it cast doubt on the testimony of the defendant's possession of the equipment was innocent; and (3) it tended to enhance the testimony of the two principal government witnesses, whose reputation for honesty and integrity was not good. The credibility of these two witnesses will be discussed in detail later.

Here, the prejudice was heightened by the fact that the source of the improper character evidence was a police officer.

■ Furthermore, we must point out that the government was permitted to attack the defendant's character in several ways which were proper. Yet the only evidence produced which was damaging to the defendant's reputation was the erroneously admitted improper character testimony.[4]

The government next argues that, even though the character testimony was prejudicial, the case against the defendant was so strong that the error was harmless. We cannot agree.

■ Although the strength of the government's case is relevant in determining whether error is harmless,

" * * * [T]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rath-

er, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

Kotteakos v. United States, *supra* 328 U.S. at 765, 66 S.Ct. at 1248.

Thus, while there may be sufficient evidence to support a conviction had the error not occurred and while a new trial might lead to the same result, we must reverse because we cannot say that the jury was not substantially swayed by the serious error committed here. United States v. Crawford, 438 F.2d 441, 446 (8th Cir. 1971); Echert v. United States, 188 F.2d 336, 342 (8th Cir. 1951). " * * * [T]he crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own." Kotteakos v. United States, *supra* 328 U.S. at 764, 66 S.Ct. at 1247.

The major contention of the defense was that the defendant did not know the tractor was stolen. On this point, the evidence was in conflict. The solution to this conflict turned partially on whether the defendant's witnesses or the government's witnesses were believed.

The defendant developed considerable testimony tending to cast doubt on the credibility of the government's principal witnesses, Davis and Mitchell. The evidence showed that: (1) both Davis and Mitchell had criminal records; (2) both were testifying under grants of immu-

---

4. The government has great latitude in cross-examining character witnesses or introducing evidence in rebuttal. As the Supreme Court pointed out in Michelson v. United States, *supra* 335 U.S. at 479, 69 S.Ct. at 220:

" * * * The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans." (Footnotes omitted.)

nity from prosecution; (3) both had recently been engaged in cheating their employer; and (4) both testified that they bore grudges against the defendant. In addition, various defense witnesses testified that Davis and Mitchell had poor reputations for honesty within the community.

Aside from the testimony of Mitchell and Davis, there were other circumstances developed at the trial which the jury could have concluded pointed to the guilt of the defendant. But they were not so strong as to justify that Court in saying that the improper evidence did not substantially sway the jury. Echert v. United States, *supra* at 342.

█ Finally, the government contends that any prejudice in admitting this testimony was cured on cross-examination because the police officer admitted that he had no knowledge of any arrests or convictions of the defendant. But the police officer also stated that he had been investigating the defendant in regard to other thefts of construction equipment. This clearly intensified the prejudice caused by his original testimony by relating his opinion concerning the defendant's bad character to the same type of crime for which the defendant was on trial. See, United States v. Crawford, *supra*. Thus, we simply do not agree that the cross-examination cured the prejudice.

The argument could be made that the defendant cannot complain because he elicited this additional prejudicial testimony; but we believe that, once the improper testimony was admitted over objection, the defense counsel had no choice but to attempt to show the inadequate basis for the police officer's conclusion. United States v. Acreman, 434 F.2d 338 (8th Cir. 1970) (by implication); United States v. Heffner, 420 F.2d 809 (4th Cir. 1970); United States v. King, 378 F.2d 359 (6th Cir. 1967); Dupes v. Johnson, 353 F.2d 103 (6th Cir. 1965). The government will not be heard to say

that the defendant may attempt to cure the prejudice only at his peril.

We reverse the decision of the trial court.