492 F.2d 1361
 UNITED STATES of America, Appellee,
v.
Clifford Lavern BISHOP, Appellant.
UNITED STATES of America, Appellee,
v.
Lewis Frank GRAYSON, Appellant.
UNITED STATES of America, Appellee,
v.
Nathaniel J. BRANCATO, Appellant.
UNITED STATES of America, Appellee,
v.
George L. HUSONG, Appellant.
UNITED STATES of America, Appellee,
v.
James S. DUARDI, Appellant.
UNITED STATES of America, Appellee,
v.
Jack Michael KING, Appellant.
 Nos. 73-1287, 73-1288, 73-1300, 73-1310, 73-1358 and 73-1705.
 United States Court of Appeals, Eighth Circuit.
 Submitted Dec. 13, 1973.
Decided Feb. 28, 1974, Rehearing Denied April 22, 1974.
 
 Robert G. Duncan, Kansas City, Mo., and Stephen Jones, Enid, Okl., for appellants.
 Gary Cornwell, Special Atty., Crim.Div., Dept. of Justice, Washington, D.C., for appellee.
 Before BRIGHT and STEPHENSON, Circuit Judges, and STUART,* district judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 Appellants were convicted under 18 U.S.C. 371 of conspiring to violate 18 U.S.C. 1952, by promoting and establishing an unlawful activity, and by promoting such unlawful activity by traveling and causing others to travel in interstate commerce and by the use of telephone facilities in interstate commerce. The case was tried to a jury before the Honorable John W. Oliver, United States District Judge, Western District of Missouri, upon Count I of a two count indictment.
 
 
 2
 These consolidated appeals raise the principal question of whether an exhibit not admitted into evidence, but inadvertently delivered to the jury during its deliberations by the Court clerk, constituted prejudicial error, thus necessitating a new trial. Insufficiency of the evidence and other trial errors are also urged. After carefully considering this record totalling nearly one thousand pages, we conclude that appellants were not prejudiced by the errors alleged, and therefore affirm the conviction. Fed.R.Crim.P. 52(a).
 
 
 3
 The essence of the conspiracy is that between August 26, 1971 and March 26, 1972, appellants together with Olivia Mae Pitts and Jess C. Roberts, named in the indictment as co-conspirators but not defendants, conspired to promote and establish an unlawful business enterprise involving gambling, prostitution and bribery in violation of the laws of the State of Oklahoma. Interstate travel and use of the telephone facilities in interstate commerce were involved.
 
 
 4
 The government's evidence is briefly summarized as follows: On May 12, 1971, co-conspirator Roberts met with appellant Grayson, then an Oklahoma State District Attorney, for the purpose of discussing Roberts' plan to erect a private club in the vicinity of Grove, Oklahoma (within Grayson's jurisdiction). The club, known as 'Mr. Yuk,' was opened on August 26, 1971. Shortly after its opening Mr. Yuk experienced a series of raids by local authorities and charges were eventually filed against Roberts for the illegal sale of intoxicating liquors. As a result of the raids Roberts experienced financial difficulties.
 
 
 5
 In mid-December, appellant Bishop, an employee of appellant Duardi, a Kansas City, Missouri night club owner, telephoned Roberts from Kansas City and indicated that he could help Roberts with the raids problem through various political connections. Bishop also indicated to Roberts that he had an idea to make money in a business venture. Roberts then flew to Kansas City and met with appellants Bishop, Duardi and Brancato. The latter owned several businesses in the Kansas City area. During the course of the meeting, Duardi and Brancato suggested to Roberts that they might be able to help eliminate some of the raids. On January 7, 1972, Mr. Yuk was again raided, charges were filed and all the furniture from within the club was seized. Owner Roberts later met with District Attorney Grayson who said that 'he had to do it (stage the raid) for political purposes.'
 
 
 6
 On January 12 and 13, 1972, Bishop visited Grove, Oklahoma and met with appellant King and Roberts, and discussed establishing a 'vending' machine business. King, who owned the 'Show Boat' Club, also, in the vicinity of Grove, indicated that he too had been having problems with local officials; that Duardi saw to it that charges filed against him were reduced or dropped, and that he (King) in turn gave Duardi a partnership in the Show Boat. On January 13, 1972, Bishop, Roberts and King drove to Kansas City and had a partnership agreement prepared which gave Bishop an interest in Mr. Yuk. On the return trip, King indicated that he had a prior arrangement with appellants Grayson and Husong, a special investigator for District Attorney Grayson, which provided for gambling at the Show Boat.
 
 
 7
 On January 14, 1972, Roberts met with investigator Husong who indicated that the raids on Mr. Yuk could be stopped and that gambling could be arranged. Husong told Roberts that in return he and Grayson needed 20% Of the gambling proceeds 'to keep other law enforcement officers away from Mr. Yuk,'[1] and that they needed a new car for the local Sheriff. Roberts told Husong that an additional room would be added to Mr. Yuk for gambling, that there would be a motel, an amusement park and gambling at the Show Boat, owned by appellants King and Duardi, and that rather than giving 20% Of the gambling proceeds he would pay 5% Of the profits of the entire operation. The next day, Roberts met with appellants Bishop, Brancato and Duardi in Kansas City to discuss the proposed agreement to be reached with investigator Husong and District Attorney Grayson. They also discussed financing the operation through the Bureau of Indian Affairs or the Small Business Administration, and further, that 'girls' could be employed to entertain and be companions for the customers.
 
 
 8
 Bishop later confirmed the arrangements with investigator Husong, and then telephonically described some of the final details to Duardi. Several meetings followed to discuss financing and construction. Mrs. Pitts (co-conspirator) who met with appellants, was described by Duardi as a person who could obtain an 'S.B.A., or Indian loan.' On February 3, 1972, Roberts and Bishop engaged in a telephone conversation between Grove and Kansas City in connection with the arrangements with local authorities. On February 4, 1972, Bishop arrived in Grove with a 1972 Chevrolet Impala, which he and Roberts gave to investigator Husong as part of the 'deal.' Subsequently District Attorney Grayson used the auto. (The auto was leased rather than purchased ostensibly to permit its repossession should the 'deal' fail.)
 
 
 9
 It was later learned that appellants would be unable to secure an S.B.A. loan. Husong, King and Bishop blamed Roberts for the failure to secure this financing. According to Roberts, however, Husong subsequently told Roberts that 'Mr. Grayson and himself were going to acknowledge all of the agreements we had had prior to that time concerning the notification of the raids, allowing gambling in the club, were going to keep the car that had been given them, but they would make the payments on the car and they would expect no percentage out of the gambling.' Roberts replied 'that it couldn't work that way * * * once this was started we had to stick to it, there was too much money had been spent to back out at this time.' On February 29, 1972, King, who was in Denver with Bishop and Roberts to secure a bingo machine for Mr. Yuk, learned in a telephone conversation with his wife at Grove that Internal Revenue men were in Grove. It was agreed they 'would let things lay quiet for a while until this simmered down.'
 
 
 10
 Appellants were subsequently indicted on the conspiracy charge which alleged 22 overt acts.[2] Warrants were issued for their arrests on August 23, 1972. Of the eighteen witnesses who testified during the course of the trial, all but one were called by the government. Co-conspirator Roberts was the chief witness for the government. His testimony was corroborated in several respects by other employees who testified. Co-conspirator Pitts was called by the defense.
 
 
 11
 A great deal of documentary evidence was introduced during the course of the trial. Among the offered exhibits was the government's Exhibit R, purporting to be 'a summary of telephone records and the corresponding business records of telephone companies upon which that summary is based, prepared by F.B.I. agents.'[3] Judge Oliver refused to admit Exhibit R because of the form of the exhibit.[4] He later explained in his order of January 2, 1973, that 'defendants' objections to that exhibit were vallid only in a limited sense and that the difficulty with the exhibit in the form it was offered was that many phone calls which had no probative value (in that they simply reflected calls between pay telephones in public places) were listed together with records of telephone calls between identified individuals which could lbe relevant.'
 
 
 12
 Shortly after the jury began its deliberation it requested all the exhibits. Counsel agreed that all exhibits admitted into evidence should be sent to the jury, but that exhibits attached to court Exhibit 1 (the pretrial stipulation relating to authenticity of certain exhibits, see note 3, supra) should not be included. In the presence of defense counsel and with the telephonic approval of government counsel, Judge Oliver directed the court clerk to check all exhibits carefully so that evidence not admitted could not inadvertently be transmitted to the jury. The jury deliberated approximately six and one-half hours and returned guilty verdicts as to all defendants. Despite the precautions taken, the court clerk advised the court that when he collected the exhibits after the trial he found Government Exhibit R among the exhibits that went to the jury room.
 
 
 13
 Appellants now urge that such transmission constitutes reversible error, necessitating a new trial.
 
 
 14
 It is undisputed that the delivery to the jury of Exhibit R constitutes error. Osborne v. United States, 351 F.2d 111, 115 (CA8 1965); accord, Dallago v. United States, 138 U.S.App.D.C. 276, 427 F.2d 546, 555 (1969). But, unless the error was prejudicial to 'substantial rights' of appellants, the verdict and judgment will stand.[5] Kotteakos v. United States, 328 U.S. 750, 764-765, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946); Osborne v. United States, supra, 351 F.2d 111, 117 (CA8 1965); see, United States v. Warner, 428 F.2d 730, 736-738 (CA8 1970). In order for error to be declared harmless the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendants' conviction. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In Homan v. United States, 279 F.2d 767, 771 (CA8 1960), we stated:
 
 
 15
 The reviewing court must, of course, be able to say with fair assurance that the errors complained of could not, with natural operation in the total setting and proceedings had, be regarded as having possessed any influencing effect. Blackwell v. United States, 244 F.2d 423, 431 (CA8 1957).
 
 
 16
 The weight of the government's evidence is relevant in determining the effect of the error. United States v. Straughan, 453 F.2d 422, 427 (CA8 1972); Osborne, supra, 351 F.2d at 118. In this case, it is abundantly clear from the lengthy trial record, that the evidence of guilt is overwhelming. The significant testimony of the government's key witness, although admittedly an accomplice, was substantially corroborated by other credible testimony. As such, Exhibit R did not serve to corroborate any significant portion of Roberts' testimony. We fully agree with Judge Oliver's statement in his order of February 28, 1973 which denied appellants' supplemental and joint motion under Fed.R.Crim.P. 52, that 'independent evidence was adduced and admitted without objection in regard to any significant telephone call which could in any way be said to have remotely been corroborative of what counsel stated are the 'essential points' in Roberts' testimony.' The fact that some of the calls were made from pay telephones was a fact independently known to the jury by other evidence in this record.
 
 
 17
 As previously noted, the objectionable nature of Exhibit R was its form. It was not rendered inadmissible because it was highly inflammatory or prejudicial. Our decision in Osborne, supra, is distinguishable on this basis. The original telephone records which served as an official source for Exhibit R were all in court, identification had been waived, and they were made a part of the record available to all parties.[6] Furthermore, as acknowledged by defense counsel during oral argument of this appeal, no objection was made with respect to the accuracy of the exhibit. In the form in which it was offered Exhibit R simply lacked probative value with respect to certain telephone calls. The most that can be said is that the exhibit showed a large number of calls to and from the listed numbers during the period indicated.
 
 
 18
 In the final analysis, we are satisfied beyond a reasonable doubt that on this record the error in question did not have any influencing effect upon the jury, and therefore did not contribute to the convictions. Chapman v. California, supra, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); Homan v. United States, supra, 279 F.2d 767, 771 (CA8 1960); accord, United States v. Porter, 441 F.2d 1204 (CA8 1971); see, Kotteakos v. United States, supra, 328 U.S. 750, 764-765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); and compare, United States v. Straughan, supra, 453 F.2d 422, 427 (CA8 1972), with United States v. Warner, supra, 428 F.2d 730, 736-738 (CA8 1970); see also, Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). Judge Oliver did not abuse his discretion in denying appellants' motion for a new trial because of the jury's exposure to Exhibit R.
 
 
 19
 Appellants next contend that they were denied a fair trial because of the accumulation and cumulative effect of multiple prejudicial references, evidence and statements throughout the trial.[7] We are satisfied from a careful examination of this record that whatever potential prejudice there may have been was cured by appropriate instructions by Judge Oliver.
 
 
 20
 Lastly, appellants urge that the trial court erred by submitting to the jury the alleged offense of conspiracy to engage in a business enterprise involving gambling, prostitution and bribery, and in the conjunctive, that there was not sufficient evidence to support a conviction. This record overwhelmingly substantiates appellants' guilt in all respects. The convictions of guilt are therefore affirmed.
 
 
 21
 Affirmed.
 
 
 
 *
 W. C. STUART, District Judge, Southern District of Iowa, sitting by designation
 
 
 [1]
 The record discloses that 'other law enforcement officers' allegedly referred to the State Alcoholic Beverage Control Board, local Sheriff Lloyd Rosell and Leo Albro of the Oklahoma State Crime Bureau
 
 
 [2]
 Overt Act #22 under Count I of the indictment, charged that 'on or about March 16, 1972, Clifford Lavern Bishop and Jack Michael King attempted to kill Jess C. Roberts near Grove, Oklahoma.'
 In chambers, Judge Oliver warned that proof of the shooting of Roberts as an overt act 'might introduce problems of prejudicial evidence * * *.' Government counsel therefore agreed to avoid this area of examination. Under careful guidance of the trial court no evidence with respect thereto was admitted. Overt Act #22 was not submitted to the jury.
 
 
 [3]
 Transcript at 658. Of the twenty-two overt acts under Count I of the indictment, four related to telephone calls. Exhibit R was captioned 'Key to review of telephone toll records.' Its intended use was to summarize allegedly relevant telephone company toll records aggregated in stipulation Exhibit E, admitted as part of Court Exhibit 1. Stipulation Exhibit E consisted of 'true and accurate copies of the business records of Southwestern Bell and Century Telephone Companies.' It was further stipulated that telephones bearing certain telephone numbers were either listed to various named individuals, or were pay telephones, and that the telephones were located at designated locations at the particular times and dates indicated on the face of the records. Exhibit R contained a listing by date of telephone calls made from and to specified numbers which were identified, i.e., (Yuk), (Grayson), etc. The exhibit itself did not purport to show who actually made the call or participated in it
 
 
 [4]
 The government failed to delete the records of phone calls which the court ruled had no probative value
 
 
 [5]
 The issue of appellants' failure to screen the exhibits is not before us. We of course would not affirm on this basis where appellants had suffered substantial prejudice. See, United States v. Burket, 480 F.2d 568, 571 (CA2 1972). However, we note from the record that at least one defense counsel in the instant cause was an attorney of record in the Osborne case, also tried before Judge Oliver. In spite of all the precautions taken herein in light of Osborne, to assure that only proper exhibits were sent to the jury, the record indicates that only the court clerk examined the exhibits. We realize that the methods used for transmission of exhibits to the jury are within the discretion of the trial court. Nevertheless, in light of the continuing nature of this problem, we strongly urge the position of the First Circuit stated in United States v. Yoppolo, 435 F.2d 625, 627 (CA6 1970):
 When a case is ready for submission to the jury, counsel for both parties should look over all the exhibits to make sure that no exhibit which had not been admitted in evidence will be sent into the juryroom. They ought not to leave this task solely to the clerk.
 See, United States v. Sheehan, 428 F.2d 67, 72 (CA8 1970); see also, Dallago v. United States, supra, 138 U.S.App.D.C. 276, 427 F.2d 546, 554 (1969).
 
 
 [6]
 Stipulation Exhibit E, Court Exhibit 1, note 3, supra
 
 
 [7]
 Among appellants' claims are allegedly improper references made with respect to Overt Act #22 by the government in its opening statement, not then objected to (see also, note 2, supra), and to another criminal act of appellant Grayson in mortgaging leased property (automobile), evidence purporting to establish a nexus between appellants and organized crime, and improper argument by government counsel