STATE of Minnesota, Respondent,

v.

Dale Matthew OLSON, Appellant.

No. 49261.

Supreme Court of Minnesota.

March 14, 1980.

Delaney & Thompson, Peter J. Thompson, and John W. Lindquist, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, David W. Larson, Thomas A. Weist and Janeen E. Rosas, Asst. County Attys., Minneapolis, for respondent.

OTIS, Justice.

Dale Olson appeals from his conviction on three counts of first-degree murder for the burning deaths of Lueberta Davis and her two children on January 19, 1978. Appellant argues that he was denied his constitutional right to be confronted by the witness against him when the trial court admitted as substantive evidence two unsworn, *ex parte* statements made to the police by Olson's accomplice, Jean Link. The trial court held that appellant was precluded from asserting his right of confrontation because of the intimidation of Link by a co-conspirator, James Black.

We affirm.

The chain of events leading to the murders began with an attempted robbery by Black in October 1977. Upon being thwarted in the robbery, Black fled on foot to the home of Ms. Davis. He sent her and her young daughter, Tesa, back to retrieve the getaway car which the police had meanwhile staked out. The police approached and questioned Ms. Davis, but before she could answer, Tesa blurted out Black's identity and whereabouts. Black was thereupon arrested.[1]

During a two-year intermittent relationship with Jean Link, an accomplice to the murders, Black repeatedly abused her. On Monday, January 9, 1978, Black called Link from jail and asked her to find someone to commit a murder. When she refused, Black became angry and abusive. On Thursday, January 12, 1978, one week before the murders, Black instructed Link to buy two cans of gasoline, go the victims' house, and set the premises on fire. She went to the house but took no other action. She began to fear for her own life and arranged to spend Friday, January 13, 1978, at a friend's house. That night, as Link was preparing to leave, a man came to her apartment, slapped her around and threatened to kill her if she told anyone about the plans. On Tuesday night, January 17, 1978, Black called Link and told her to meet the appellant Olson on Thursday, January 19, 1978, when appellant would get out of jail. On Wednesday, January 18, 1978, the person who had beaten her called Link and told her that he was watching her. On Thursday, January 19, 1978, the day of the murders, Link met with Black in jail at which time he again threatened Link with harm if she did not carry out his instructions.

Appellant met Black for the first time just two weeks before the murders while he was in jail on an unrelated charge. Appellant was released about noon on January 19, 1978, and was met by Jean Link and three other women. They arranged to have Link phone him later that evening to fix a time and place to pick him up and take him to and from the Davis residence. Link did call appellant that night. She took the gas she had purchased earlier, picked up appellant around 7:30 p. m. at his fiancee's father's house in Golden Valley, and drove

---

1. Black's conviction is affirmed in *State v. Black*, 291 N.W.2d 208 (Minn.1980) released herewith.

him to Davis's home. On the way to the Davis residence, appellant told Link that he was getting paid $400.00 for the job. Link accompanied him to the door. He went in.

Appellant claims he did not take the gasoline into the house. Instead, he says, he went in and picked up clothes he was told by Black to burn. He returned to the car and Link drove him to a nearby vacant lot where he dug a hole in the snow, put the clothes in it, doused them with two and one-half gallons of gas, lit a match and burned them.

Appellant made an offer of proof that if cross-examined, Link would testify that she was at the house twice that night and that while appellant was burning the clothes elsewhere, Link picked up another person, delivered him to the victim's house, waited for him, dropped him off, and got back in time for appellant to get into the car without his having noticed whether or not the car had been gone.

Link told the police that appellant took the gas, went into the house, and came out with his jacket burned and his pants leg on fire.

As a result of the fire, either at the house or in the vacant lot, appellant's beard, hair, eyebrows, and some hair on his right leg were singed. The back of his down jacket caught fire spilling out feathers and down. His blue jeans burned and nylon from his jacket melted into them. Singed feathers and down were found both in Link's car and at the Davis house.

When appellant got back into the car, Link took him to a friend's apartment. On the way, appellant discarded his jacket because the feathers were leaking. Link dropped him off and stayed only a short time before returning home. The following day, Friday, January 20, 1978, Link was arrested about 8:00 p. m. and appellant was arrested later that night.

The police questioned Link for several hours before she finally made a statement disclosing her role in the murders. That night another statement was given and recorded. On Saturday, January 21, 1978, she led the police to the burned jacket and showed them the routes she traveled on the day of the murder. On January 23, 1978, Link gave the police a second statement in which she recounted her tour with them and discussed other aspects of the murder. She was tried first, testified on her own behalf, was found guilty and sentenced to three concurrent life sentences. Her conviction was affirmed in *State v. Link*, 289 N.W.2d 102 (Minn.1979).

Despite a court order to testify at appellant's trial, Link refused to do so. The court held Link in contempt and found that she was unavailable as a witness. Following an extensive offer by the state to corroborate by means of independent witnesses and physical evidence nearly all of the important events described by Link, the court ruled that the statements and testimony were admissible under hearsay exceptions as statements against penal interest or as necessary and trustworthy statements. The judge further ruled that Olson was not denied his right to confrontation under either the theory (1) that appellant waived his right by intimidating Link to prevent her from testifying, or (2) that under the circumstances there was no confrontation right violation because Link was unavailable and her out of court statements bore indicia of reliability.

1. The purposes of the confrontation clause are set forth in *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) where the court said:

> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives

his testimony whether he is worthy of belief.

*Id.* at 242–43, 15 S.Ct. at 339.

■ There are, however, situations in which the right of confrontation has been held not to be denied notwithstanding the witness did not take the stand. Dying declarations have long been recognized as an exception to the general confrontation rule. *Mattox v. United States,* 156 U.S. 237, 243–44, 15 S.Ct. 339–40 (1895). Prior sworn testimony is also admissible provided (1) the witness is now unavailable, (2) the same parties have tried the same issue, and (3) the defendant has had a full opportunity to cross-examine the witness at the prior trial or pre-trial hearing. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). *See State v. Shotley,* 305 Minn. 384, 387, 233 N.W.2d 755, 759 (1975). Statements of co-conspirators made in furtherance of, and during the course of a conspiracy also do not deny the right of confrontation. *Cf. Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (Georgia statute allowing the admission into evidence statements made by co-conspirators after the co-conspirators were arrested held constitutional).

This court has not expressly ruled on the issue of whether admission of statements of an unavailable co-defendant denies a defendant's confrontation right. However, in *State v. Gruber,* 264 N.W.2d 812 (Minn. 1978), despite the fact that a co-defendant's confession was admitted against the defendant at trial without objection by the defendant's attorney, the court considered the issue and said:

> [T]his court has demonstrated a strong aversion to the admission of such evidence in *State v. Shotley,* 305 Minn. 384, 387, 233 N.W.2d 755, 758 (1975), where we stated:
>
> > " * * * Given * * * the aversion of this court to dilution of the

defendant's right to be confronted by witnesses against him, we could not and would not affirm this conviction were it not for the fact that we consider the testimony as a whole to be overwhelmingly persuasive of defendant's guilt. * * * Our reservations on this phase of the case are such, however, as to prompt this admonition: The use of testimony of an absent witness * * * jeopardizes the fairness of the trial and may result in a reversal in any case where such testimony is used, unless the evidence of guilt is so strong as to convince us that the * * testimony * * * did not affect the outcome of the case. For this reason, as a matter of policy, the use of such testimony as substantive evidence should be avoided."

*Id.* at 818 (emphasis deleted). Gruber's conviction was reversed on other grounds and thus the court did not expressly hold that there was a constitutional violation.

The two statements[2] in issue are unsworn, *ex parte* statements made to the police during extensive questioning. Absent a finding of harmless error or a finding that the defendant is precluded from asserting his confrontation right because of his wrongdoing, the case would present a clear denial of the defendant's constitutional right to confront the witnesses against him.

■ Denial of the right of confrontation can be harmless only when it is harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). The remaining evidence must be "overwhelmingly persuasive of defendant's guilt." *State v. Shotley,* 305 Minn. 384, 387, 233 N.W.2d 755, 758 (1975). Without Link's testimony, appellant's alibi would be far more plausible. There were no fingerprints and no one else saw him take the gasoline into the house. Consequently Link's testi-

---

2. The third statement admitted was testimony given by Link at her own trial. Although the admissibility of this testimony was not raised on appeal, we do note that the holding of this case with regard to the defendant's waiver of his right of confrontation would act to allow the admission into evidence of such prior testimony.

mony cannot by any standard be considered harmless.

■ 2. A defendant who procures the absence of a witness by threats, bribes, concealment or intimidation is precluded from asserting his right to confront that witness. *Reynolds v. United States*, 98 U.S. 145, 158–61, 25 L.Ed. 244 (1879); *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). *United States v. Balano*, —— F.2d —— (10th Cir. 1980). *See State v. Hill*, 253 N.W.2d 378, 384–84 (Minn.1977).

■ Appellant may not profit from his own wrongdoing. *Reynolds v. United States*, 98 U.S. 145, 159, 25 L.Ed. 244 (1879). Absent a conspiracy, when a defendant threatens a witness after he has been apprehended and causes the witness to remain mute, only the defendant who made the threats is precluded from asserting his right of confrontation. *Motes v. United States*, 178 U.S. 458, 471–74, 20 S.Ct. 993, 998, 999, 44 L.Ed. 1150 (1900); *Regina v. Scaife*, 17 Q.B. 238, 242–43, 117 Eng.Rep. 1271, 1273 (1851). *See United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976).

The state relies on *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976) in which the witness had testified at a grand jury hearing and then was intimidated by the defendant so that he refused to testify at trial. The eighth circuit found the following factual basis for the threats to be sufficient to find a waiver:

> [O]n March 15, 1975, the evening before the commencement of the trial in this case, Tindall advised a DEA agent, John O'Connor, that he did not desire to testify at trial because he feared reprisals. When Agent O'Connor questioned Tindall about specific threats, Tindall responded equivocally. O'Connor reminded Tindall of the grand jury testimony and told Tindall that even though Carlson was aware of that testimony Tindall had not suffered any harm from Carlson. Tindall stated: "Yes, I know, but if I don't testify at trial at least I'll have a chance. If I do, it will be over for me." When Tindall continued to evade any questions as to the source of the threats, Agent O'Connor inquired: "Do you realize that in refusing to discuss this particular topic with me you are in essence confirming the fact that you received threats from Carlson?" Tindall responded: "I know. You have got the message." On the following day in the presence of Tindall's attorney, the Government verified that Tindall would not testify at trial. When asked if he had deliberately lied to the Government, Tindall stated that he had always been truthful with the Government and before the grand jury. Further, in a conversation with Agent Nelson, Tindall said he did not want to discuss the reason for his not testifying. In response to Nelson's inquiry as to whether Tindall thought that Carlson would kill him if he were to testify Tindall stated that "he did not want to have to find out."

*Id.* at 1352–53.

■ The facts constituting intimidation are much stronger in this case than in *Carlson*. Prior to the commission of the murders, Black repeatedly threatened Link to prevent her from disclosing his plans and to induce her to carry them out. He made it clear that if she did not obey him Link and her baby were in serious danger. One of Black's agents physically beat Link on one occasion when she had not followed Black's orders. The same person later called Link to warn her that he was watching her to be sure she did as she was told.

The very fact of the Davis murders constituted a threat to Link. The woman murdered was, like Link, a potential witness. Link's fear for herself and her baby was eminently reasonable in the light of their fate.

Appellant was aware of Black's motive. He admitted that he was trying to destroy Black's clothing because Black claimed it implicated him in a robbery. Appellant acknowledges that Black intimidated and threatened Link in furtherance of his plot to silence her. Under these circumstances the wrongful intimidation of Link by Black

can be imputed to appellant insofar as he was acting as a co-conspirator to destroy evidence against Black which might implicate Black in a robbery prosecution. Consequently, we hold that appellant is precluded from asserting his confrontation rights.

4. The imposition of three consecutive life sentences for the first-degree murder of three separate victims in a single behavioral incident is not barred by either Minn.Stat. § 609.035 (1978) or Minn.Stat. § 609.15 (1978). In *Bangert v. State*, 282 N.W.2d 540, 547 (1979), we expressly held that Minn.Stat. § 609.15 does not preclude the imposition of consecutive life sentences. In *Bangert* we also stated that in the case of multiple victims Minn.Stat. § 609.035 (1978) "is inapplicable so long as the multiple sentences do not result in punishment grossly out of proportion to the defendant's culpability." *Bangert v. State*, 282 N.W.2d 540, 547 (1979). Appellant with premeditation methodically burned three people to death. Multiple life sentences are appropriate. *See State v. Briggs*, 256 N.W.2d 305 (Minn.1977); *State v. Prudhomme*, 303 Minn. 376, 228 N.W.2d 243 (1975); *State ex rel. Stangvik v. Tahash*, 281 Minn. 353, 161 N.W.2d 667 (1968); *State v. Johnson*, 273 Minn. 394, 141 N.W.2d 517 (1966). We affirm.