Dale Mathew OLSON, Petitioner,

v.

Les GREEN, Chairman of Minnesota Board of Corrections; Warren Spannaus, Attorney General, State of Minnesota; Thomas L. Johnson, Hennepin County Attorney, Respondents.

No. 3–80 Civil 356.

United States District Court,
D. Minnesota,
Third Division.

Nov. 26, 1980.

Delaney & Thompson, Ltd. by Peter J. Thompson and John W. Lundquist, Minneapolis, Minn., for petitioner.

Thomas L. Johnson, Hennepin County Atty. by Edward C. Anderson, Asst. County Atty., Minneapolis, Minn., for respondents.

## MEMORANDUM ORDER

ALSOP, District Judge.

This matter comes before the court upon the petition of Dale Mathew Olson for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1980). On September 29, 1980, United States Magistrate George G. McPartlin issued his Recommendation that the petition be denied. Petitioner filed timely Exceptions to the Recommendation.

Petitioner was charged with three counts of murder in the first degree in connection with the deaths of Lueberta Davis and her two children on January 19, 1978. The matter was tried to a jury from May 1 to May 17, 1978 in Hennepin County District Court. A key witness, Jean Link, refused to testify at the trial because of threats made to her by James Black. During the trial, over objections by defense counsel on hearsay and Confrontation Clause grounds, Lieutenant Breen of the Minneapolis Police Department was permitted to relate the contents of statements Jean Link made to him on January 20 and January 23, 1978.

Lieutenant Breen testified that Ms. Link initially stated she was home watching television on the evening of January 19, 1978, and then stated that she was actually home listening to her stereo and reading a book that evening. Finally, Ms. Link stated that she had not been home but had followed the orders of James Black to pick up a man at Lyndale Avenue and Lake Street in Minneapolis, drive him to Lueberta Davis's house, wait for him outside, and then drive him where he wished to go. Ms. Link stated that the man was white, approximately six feet tall and 190 pounds, wearing a dark ski jacket and ski mask, blue jeans and brown leather gloves. She indicated that she waited for him outside of the Davis house for one-half hour and then gave him a ride back to the place where she had picked him up.

Upon further questioning, Ms. Link stated that she picked up the man at his home rather than on Lake Street, and she identified the man as Dale Olson.

Ms. Link also related that James Black had told her in December of 1977 that he "had to get rid of" Lueberta Davis because she had implicated him in a robbery. Ms.

Link further indicated that in the first week of January, 1978, James Black had ordered her to buy gasoline and burn Lueberta Davis and her children to death, and that she had agreed to buy the gasoline but had refused to kill the Davises.

Ms. Link also stated that on January 17, 1978, James Black telephoned to tell her to be in the courtroom when Dale Olson was released from jail so that she could offer him a place to stay. According to her statements, she visited James Black in jail on January 19, 1978 and was told to take the gasoline she had bought, pick up Dale Olson, and drive to the Davis house. Ms. Link indicated that James Black did not tell her the purpose of the trip, but told her she "would be sorry" if she did not follow his instructions.

Ms. Link stated that she telephoned Dale Olson and obtained directions to his house, and that when she arrived at his house, he asked if she had the gasoline. During the drive to the Davis house, Ms. Link said Mr. Olson did not tell her what he planned to do at the Davis house but did ask if James Black was "a man of his word" who would keep his promise to give Mr. Olson $400 "for an apartment for himself and his girlfriend."

Ms. Link said she refused Dale Olson's request to accompany him into the Davis house, instead remaining in the car with the headlights off and the motor running. She stated that Mr. Olson pulled the ski mask over his face, took the gasoline from the trunk and entered the house. She indicated that she did not hear any explosions or see any flames coming from the house, but "thought" she "might have seen some kind of a flame on his leg" when Mr. Olson came running back to the car. According to her statements, Ms. Link saw no burns on Mr. Olson but noticed that his jacket was burned and was leaking feathers.

Ms. Link further stated that after leaving the Davis house, Dale Olson threw his jacket out of the car as she drove to an apartment in Anoka County.[1] At the apartment,

---

1. On January 23, 1978, Ms. Link told Lieutenant Breen that she had not seen Mr. Olson

throw the jacket out the window, and that

Ms. Link heard Mr. Olson tell a friend that he had burned his jacket when he went too close to a fire in which he was burning clothes that had been worn in a robbery.

At Mr. Olson's trial, defense counsel introduced part of the testimony given by Ms. Link at her trial for the murder of the Davises. This testimony was substantially similar to the statements given to Lieutenant Breen.

At her trial, Ms. Link testified that on January 9, 1978, James Black had twice requested that she hire someone to kill Lueberta Davis, and that she did not believe he was serious. She testified that on January 12, 1978, James Black had told her to buy some gasoline and to start a fire at the Davis house. She testified that she was told there would be someone in the closet at the Davis house to help her.

Ms. Link stated that she bought gasoline and went to the Davis house but left after she became worried that she was being "set up." She further testified that later that day a man entered her apartment, knocked her against a wall, slapped her, and told her that he had a message from James Black. The message was that Mr. Black did not want anyone hurt, but only wanted some clothes burned, and that if the man in her apartment had to return, it would be his "last trip." According to Ms. Link, James Black called the next day to say that he did not want to hurt anyone but only wanted some clothing burned.

Ms. Link testified that on January 19, 1980, James Black told her she "would be sorry" if she did not take the gasoline with her, pick up Dale Olson, and drive to the Davis house. She testified that when she picked up Mr. Olson at his house, he was wearing a ski mask, but she did not see him pull it over his face. She said that neither Mr. Black nor Mr. Olson told her what was to occur at the Davis house, that she assumed Mr. Olson would burn clothes, but wondered if that was all Mr. Olson was to do when Mr. Olson asked if James Black would give him $400 as promised. She testified that she refused to accompany Mr.

Olson inside the house because she feared there was a "set up" to kill her.

According to Ms. Link's trial testimony, when Mr. Olson left the Davis house it "looked like a piece of his pants leg was on fire." She said they drove from the Davis house to an apartment in Anoka, stopping en route at a service station where Mr. Olson threw away his burned jacket.

Dale Olson was found guilty of three counts of murder in the first degree. On appeal, the Minnesota Supreme Court held that Mr. Olson's Confrontation Clause rights had not been violated by the admission into evidence of the statements made by Jean Link to police officers. *State v. Olson*, 291 N.W.2d 203 (Minn.1980). Mr. Olson subsequently filed a petition for a writ of habeas corpus, contending that the introduction of these statements violated his constitutional rights. In their "Answer to Writ of Habeas Corpus and Motion to Dismiss," respondents argue that: (1) Mr. Olson was not denied his right to confrontation and (2) in any event, Mr. Olson is precluded from raising a sixth amendment confrontation claim because of his actions and those of James Black. The court will examine these arguments in turn.

I. The United States Supreme Court recently clarified Confrontation Clause analysis. In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court stated that:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness. [*Id.*, at 2539.]

instead Mr. Olson may have thrown away the jacket at a service station where they stopped.

 The court finds that Ms. Link's statements at her trial bore adequate "indicia of reliability" to be admissible,[2] and that—particularly in light of other strong evidence of petitioner's guilt—any error in admitting her similar statements to police officers was harmless beyond a reasonable doubt.[3]

Jean Link indisputably was unavailable. Her trial testimony was given under oath. The oath helps guarantee reliability, both by "impressing [the witness] with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). Moreover, Ms. Link was testifying in "proceedings conducted before a judicial tribunal, equipped to provide a judicial record of the hearings." *Ohio v. Roberts, supra*, 100 S.Ct., at 2540, quoting *California v. Green, supra*, 399 U.S. at 165, 90 S.Ct. at 1938 (1976). Finally, Ms. Link's cross-examination by the government's attorney:

comported with the principal *purpose* of cross-examination: to challenge "whether the declarant was sincerely telling what [s]he believed to be the truth, whether the declarant accurately perceived and remembered the matter [s]he related, and whether the declarant's intended meaning is adequately conveyed by the language [she] employed." Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv.L.Rev. 1378, 1379 (1972). [*Ohio v. Roberts, supra*, 100 S.Ct., at 2541.][4]

Though cross-examination of Ms. Link at trial conceivably may have benefitted Mr. Olson, there was no constitutional way to compel Ms. Link to testify or to undergo cross-examination. In this case, it simply was not possible to provide Dale Olson with what

the [Confrontation] Clause envisions: "a personal examination and cross-examination of the witness in which [he] has an opportunity not only of testing the recollection and sifting the conscience of the witness, but of compelling [her] to stand face to face with the jury in order that they may look at [her], and judge by [her] demeanor upon the stand and the manner in which [s]he gives [her] testimony whether [s]he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, at 242–243, 15 S.Ct. 337 at 339, 39 L.Ed. 409. [*Ohio · v. Roberts, supra*, 100 S.Ct., at 2538.]

Information within Ms. Link's knowledge could be presented at trial only through her previous statements. The Confrontation Clause's "underlying purpose" is "to augment accuracy in the fact-finding process," *Ohio v. Roberts*, 100 S.Ct, at 2539, and the Clause is no bar to the admission of prior statements of an unavailable witness which, like those of Ms. Link at her trial, were made under circumstances that indicate their reliability. *See id.*, at 2538–39; page 29, *supra*. The jury had "a satisfactory basis for evaluating the truth" of Ms. Link's statements, *Ohio v. Roberts*, 100 S.Ct., at 2543, quoting *California v. Green, supra*, 399 U.S. at 161, 90 S.Ct. at 1936, and Mr. Olson's counsel adeptly pointed out in his

---

**2.** Petitioner does not challenge the admission of these statements as violative of his constitutional rights. Nevertheless, the court finds it necessary to determine whether their admission was constitutional. The court holds that petitioner did not waive his Confrontation Clause rights by introducing these statements, which were substantially similar to—and no more incriminating than—testimony which the jury already had heard.

**3.** It is irrelevant to the resolution of this issue that Ms. Link's trial statements were introduced into evidence by petitioner rather than by the government. The record indicates, in

any event, that the prosecutor would have attempted to introduce Ms. Link's trial statements if her statements to police officers had not been admitted.

**4.** In addition, at least some of Ms. Link's statements properly were admitted into evidence under the long-standing hearsay exception for statements against penal interest. *See* Fed. R.Ev. 804(b)(3). Hence, these statements are sufficiently reliable to withstand a Confrontation Clause challenge. *See* page 29, *supra; Dutton v. Evans*, 400 U.S. 74, 88–89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1976).

closing argument the reasons Ms. Link might not have testified truthfully. Under these circumstances, the admission of statements made by Ms. Link under oath at her trial did not violate the confrontation rights of Dale Olson.

■ The court need not decide whether Ms. Link's statements to police officers bore adequate "indicia of reliability" to meet a confrontation clause challenge. The content of these statements is so close to that of Ms. Link's admissible trial testimony that any error in admitting them was harmless beyond a reasonable doubt.

II. In *Ohio v. Roberts, supra*, the United States Supreme Court also stated the following:

> The Court ... has recognized that competing interests, if "closely examined," *Chambers v. Mississippi*, 410 U.S. [284], at 295, [93 S.Ct. 1038 at 1045, 35 L.Ed.2d 297], may warrant dispensing with confrontation at trial. *See Mattox v. United States*, 156 U.S. [237], at 243 [15 S.Ct. 337 at 340, 39 L.Ed. 409] ("general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case.") Significantly, every jurisdiction has a strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings. [100 S.Ct., at 2538.]

The federal courts that have considered the question have held that a person who procures the absence of a witness by threats or other means is deemed to waive his or her confrontation right. *See, e.g., United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). However, it does not appear that any federal court has considered whether the co-conspirator of one who procures the absence of a witness is also deemed to waive his or her confrontation right.

■ Ordinarily, a person cannot waive the sixth amendment right to confrontation of another. *See, e.g., Motes v. United States*, 178 U.S. 458, 472, 20 S.Ct. 993, 998, 44 L.Ed. 1150 (1900). However, the court concludes that the actions of a co-conspirator should in some circumstances result in the vicarious waiver of the confrontation rights of another. The silencing of a witness by a member of a conspiracy cannot be permitted to deprive a co-conspirator's jury of relevant information possessed by that witness. Thus, to prevent Dale Olson from benefitting from the threats by Mr. Black against Ms. Link, Ms. Link's statements must be admissible.

As the United States Court of Appeals for the Eighth Circuit said in *United States v. Carlson, supra*, 547 F.2d, at 1359:

> [C]onsiderations of public policy and effective administration of justice enter into the resolution of issues of this type. The law will not place its imprimatur on the practice of threatening government witnesses into not testifying at trials and courts should not permit the accused to derive any direct or tangential benefit from such conduct.... To permit the defendant to profit from such conduct would be contrary to public policy, common sense and the underlying purpose of the confrontation clause.

When deciding whether to admit Ms. Link's prior statements, the trial court had before it clear and convincing evidence[5] that Dale Olson was involved with James Black in a conspiracy to murder Lueberta Davis and her two children.[6] In addition to Ms. Link's statements to police officers, the

---

5. The trial court did not need proof beyond a reasonable doubt that Mr. Olson was involved in a murder conspiracy. If such proof were required, waiver could occur only when proof of guilt beyond a reasonable doubt existed *without* the testimony of the threatened witness—i.e., only when that witness's testimony was not necessary to the prosecution's case.

6. The court does not adopt the rationale of the Minnesota Supreme Court that "the wrongful intimidation of Link by Black can be imputed to [petitioner] insofar as he was acting as a co-conspirator to destroy evidence against Black which would implicate Black in a robbery prosecution." *State v. Olson, supra*, at 207–208.

court had before it her statements under oath at her trial, as well as the government's offer of proof. The prosecutor offered to prove the following: (1) that prior to January 20, 1978, Ms. Link reported to Ron and Jackie Johnson a conspiracy to commit murders similar to those committed; (2) that James Black requested fellow inmates of Hennepin County Jail to commit those murders; (3) that Dale Olson was a close friend of James Black in January of 1978; (4) that Jean Link met Dale Olson in court the day before the murder; (5) that the day before the murder, James Robert, a jail chaplain, gave Ms. Link a message from Mr. Black to "carry out our plan;" (6) that two cans of gasoline were found at the scene of the fire; (7) that on January 21, 1978, a police officer detected singed hair on Dale Olson's right leg; and (8) that Dale Olson's claim of burning clothes in a lot near the Davis house is unbelievable, particularly in view of the evidence that no such lot exists. Mr. Olson's attorney did not dispute the government's ability to offer evidence to prove these alleged facts.

Since clear and convincing evidence demonstrates Dale Olson's involvement in a conspiracy to murder the Davises, the public interest requires that the acts of co-conspirator James Black which prevented Jean Link from testifying about the murders, and which apparently were undertaken by Mr. Black on behalf of both Mr. Olson and himself, result in a waiver of Mr. Olson's right to confront Ms. Link.[7] The State's legitimate interests in preventing Dale Olson from benefitting from Mr. Black's actions and in deterring similar actions by co-conspirators in the future "warrant dispensing with" Mr. Olson's confrontation right. *See Ohio v. Roberts, supra,* 100 S.Ct., at 2538.[8] Accordingly, for this additional

reason there was no constitutional error in the admission into evidence of Ms. Link's statements to police.[9]

Upon the foregoing,

IT IS ORDERED That the petition of Dale Mathew Olson for a writ of habeas corpus be and it hereby is in all things denied.

---

7. The court does not decide whether Mr. Olson was directly involved in threats made to Ms. Link and thereby waived his confrontation rights.

8. It must be emphasized that the rule which the court announces today poses no threat to the accused's sixth amendment rights to confront and cross-examine all *available* witnesses against him.

9. Petitioner does not contend that the admission of Ms. Link's statements violated his fifth amendment rights by depriving him of a fair trial, and the court specifically finds that the admission of these statements did not deprive Dale Olson of a fair trial. *See United States v. Carlson, supra,* 547 F.2d at 1340 n.4.