**Dale Matthew OLSON, Appellant,**
**v.**

**Leslie GREEN, Chairman of Minnesota Board of Corrections, and Warren Spannaus, Attorney General of the State of Minnesota, Appellees.**

No. 80–2178.

United States Court of Appeals, Eighth Circuit.

Submitted May 22, 1981.

Decided Jan. 13, 1982.

Rehearing and Rehearing En Banc Denied Feb. 12, 1982.

Certiorari Denied June 1, 1982. See 102 S.Ct. 421.

---

Delaney & Thompson, Ltd., by John W. Lundquist, argued, Minneapolis, Minn., for appellant.

Thomas L. Johnson, Hennepin County Atty., Edward C. Anderson, Asst. Hennepin County Atty., argued, Minneapolis, Minn., for appellees.

Before HEANEY and BRIGHT, Circuit Judges, and HARRIS,* Senior District Judge.

BRIGHT, Circuit Judge.

Dale Matthew Olson seeks postconviction relief from his state jury trial conviction for the first degree murders of Lueberta Davis and her two children. Olson received three consecutive life sentences. The federal district court [1] denied his petition for a writ of habeas corpus. We affirm.

Jean Beverly Link, Olson's separately tried and convicted accomplice,[2] refused to testify as a prosecution witness at Olson's trial in defiance of a court order. Thereafter, the prosecution introduced two statements that Link had given to police while in custody. The trial court admitted the statements as declarations against penal interest. Olson complained that admission of these custodial statements violated his sixth amendment right to confront the witness against him.

On appeal, the Minnesota Supreme Court rejected Olson's contention, concluding that

---

\* OREN HARRIS, United States Senior District Judge, Eastern and Western Districts of Arkansas, sitting by designation.

1. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota. Judge Alsop's opinion is reported at 528 F.Supp. 27 (D.Minn. 1980).

2. In fact, the State successfully prosecuted three persons for these crimes. The State first tried and convicted Link. The Minnesota Supreme Court affirmed her conviction in State v.

Link, 289 N.W.2d 102 (Minn.1979). The State next prosecuted Olson. See State v. Olson, 291 N.W.2d 203 (Minn.1980). Finally, the State prosecuted James Willis Black. After the Minnesota Supreme Court affirmed his conviction, State v. Black, 291 N.W.2d 208 (Minn.1980), Black unsuccessfully sought a writ of habeas corpus from the federal courts. Black v. Woods, 651 F.2d 528 (8th Cir.), cert. denied, —— U.S. ——, 102 S.Ct. 164, 70 L.Ed.2d 134 (1981).

he had waived his confrontation right. It held that the acts of coconspirator James Willis Black, which intimidated Link into silence, should be imputed to Olson, barring Olson from asserting his confrontation rights. *State v. Olson*, 291 N.W.2d 203, 207–08 (Minn.1980). In the subsequent habeas proceedings, the federal district court stated two grounds for denying Olson's petition to set aside the convictions: (1) the admission of Link's statements to the police constituted harmless error;[3] and (2) Olson waived his right of confrontation. 528 F.Supp. at 30.

We affirm on the ground that admission of Link's custodial statements to the police amounted to harmless error in the circumstances of this case.

## I. *The Evidence.*

To put the evidence introduced at trial into the appropriate perspective, we first examine the State's case, without reference to Link's statements to the police. We next examine the evidence used in Olson's defense, including Link's trial testimony. Finally, we consider the probable impact of the challenged statements upon the jury in light of the other testimony and evidence received during the trial.

### A. *The State's Case Without Link's Statements or Testimony.*

On January 19, 1978, at approximately 9:00 p. m., a fire occurred at 3043 Second Avenue South in Minneapolis. After firemen brought the flames under control, police found the bodies of the apartment's three occupants: Lueberta Davis, who had been gagged and bound to a bed; her daughter, Tesa, age six, who had also been tied to the bed; and her son, LaMarr, age two, who was found under the bed. Each of the victims had died from carbon monoxide poisoning. Investigators found one empty gasoline can in the apartment, and a second, partially filled can of gasoline propped between Tesa's legs. Tests indicated that gasoline had been poured throughout the apartment and on the victims.

Curtis Oppegaard, a bus driver for the Metropolitan Transit Commission, observed the outbreak of the fire while walking on the street adjacent to the Davis apartment. He first heard a "loud poof" and then saw a person run from between the houses to a yellow Volkswagen car which "took off" without its lights on. Oppegaard tentatively identified that person as a black male.

Police traced the yellow Volkswagen to Jean Beverly Link. The investigation also established a close relationship between Link and James Willis Black, an exconvict who was in the Hennepin County jail awaiting trial on robbery charges at the time of the Davis murders. The charges against Black included the robbery of a Red Owl Store in south Minneapolis on October 11, 1977. At the time of that incident, Black lived with Lueberta Davis and her two children.[4] After his arrest and incarceration, Black expressed a desire to other inmates to kill Davis to prevent her from testifying against him.

On January 9, 1978, Link told her friends, Ron and Jackie Johnson, that Black wanted her to "set fire to a house and burn a lady and her two children." Link asked Ron Johnson if he would help her kill the woman, but he refused. Approximately a week later, Link told Johnson that Black had found someone else "to do the job."

---

3. Link testified on her own behalf at her trial. *See* note 2 *supra.* At Olson's trial, Olson introduced Link's trial testimony to bolster his defense. The federal district court concluded that the admission of Link's statements to the police constituted harmless error because they were substantially similar to her properly admitted trial testimony. The district court deemed it irrelevant that Olson, rather than the State, introduced Link's trial testimony. 528 F.Supp. at 30 n.3. Contrary to the view of the district court, we think it significant that Olson introduced Link's trial testimony in support of his alibi defense. *See* text *infra* at 430–431.

4. The State's evidence indicated that Black purportedly married Lueberta Davis on December 28, 1977. The evidence also revealed that on July 21, 1976, Black had married Jean Link. Apparently neither marriage was valid.

The State's evidence also indicates that Olson and Black were in close contact between January 5 and January 19, while they were both held in the Hennepin County jail. Olson obtained his release on January 19, the day of the Davis murders. That morning, Olson told a fellow inmate to tell Black, "I'm going to court; I'll be getting out after court, and I'll take care of it." That same day, Black asked the jail chaplain to "[t]ell Jean [Link] to do what we had planned, to carry out our plan."

Several of Olson's friends, including his girlfriend, Sandra McKenzie, waited at the courthouse for his release on January 19, 1978. A woman approached them as they waited and identified herself as Jean Link. After asking which one was Sandy, Link told Sandra McKenzie that she "had to talk some business with Dale."

When Olson appeared, Link took him aside. Olson's three friends did not overhear the subsequent conversation between Link and Olson, but Sandra McKenzie heard Link tell Olson that "she would contact him later on in the evening."

During the afternoon of January 19, which Olson spent at McKenzie's house in Golden Valley, Olson told McKenzie that he was "going to burn some evidence" that night. At approximately 7:30 p. m., Link arrived at McKenzie's residence. Link and Olson asked directions to Lake Street in Minneapolis, which is in the vicinity of the Davis apartment. Between 8:00 p. m. and 8:30 p. m., Link and Olson left in Link's yellow Volkswagen.

McKenzie also testified that Olson had agreed to destroy evidence for Black because Black had told Olson that Link's father would get Olson a job. She related that Olson told her that Black had contacted some people to kill a woman. McKenzie also testified that Olson and Link talked by phone the day after the Davis murders and Olson stated: "We didn't do anything wrong; there is no reason for you to be afraid."

Minneapolis police arrested Link on January 20, 1978. As a result of her cooperation, police recovered a partially burned down-filled ski jacket that several witnesses identified as the jacket worn by Olson on January 19, 1978.

The discovery of the jacket produced highly significant, tangible evidence linking Olson to the crime. Police discovered a trail of partially burned feathers leading from the Davis apartment to the place where the bus driver, Oppegaard, had seen the yellow Volkswagen parked at the onset of the fire. Police also discovered similar feathers in Link's automobile. An expert witness testified that all these feathers matched those found in Olson's ski jacket.

Police arrested Olson on January 20, 1978, and charged him with murder. A pair of jeans taken from Olson at the time of his arrest contained several burn holes, and bits of melted nylon and feathers adhered to the fabric. The beard on the right side of Olson's face and the hair on his leg were singed.

Although no direct evidence placed Olson within the Davis apartment, the circumstantial evidence presented a strong case against Olson. The evidence established without doubt that Olson occupied Link's Volkswagen during a time period when the Davis home had burned, that Olson had been in a fire at some time that evening, and that Olson acted on Black's behalf to destroy evidence. Only Oppegaard's description of the person running from the Davis house as a black man tended to negate the inference that Olson, who is white, had been in the Davis residence at the time of the fire.

### B. *Olson's Alibi.*

Olson testified on his own behalf at his trial. In addition, Olson's counsel, without reservation, introduced the testimony Link had given at her own trial on the same murder charges. We consider first Olson's testimony.

Olson admitted entering Lueberta Davis' apartment at James Black's request on the night of the murders. He testified that his only purpose was to burn some clothing at Black's request. Black had told Olson that

he would arrange transportation to and from the apartment. Olson admitted that Jean Link drove him to Davis' apartment on the evening of January 19, entered the Davis apartment with him, but left the apartment shortly thereafter. Olson testified that Davis gave him some clothes; then he left the apartment, and got into Link's car.

Olson testified that Link then drove him to a vacant lot about five blocks away, where he took a can of gasoline out of the trunk of Link's Volkswagen.[5] He stated that he walked into the lot with the can of gasoline and clothes, dug away some snow, poured gasoline on the clothes, and, with some difficulty, ignited the clothes while standing over them. Olson testified that in starting the fire he also burned the back of his ski jacket.[6] After starting the fire, Olson returned to Link's car and they left.

At trial, Olson admitted dropping his burned jacket behind a fence when Link stopped at a gasoline station after leaving the vacant lot. They then drove to the Janine Haney residence in Anoka County. Upon their arrival, Sandra McKenzie noticed that Olson had been burned. Olson told her that he had been too close to the fire when burning Black's clothes. He then said " 'It's all over now, and James can go free.' "

Olson's testimony also revealed a possible financial motive for his participation in the burning. In addition to offering to arrange employment for Olson,[7] Black apparently had promised to loan Olson $400.

From Olson's testimony and Link's trial testimony, the defense theorized that Link returned to the Davis residence with another of Black's associates, probably a black man such as Oppegaard had described, and murdered the Davis family. In the meantime, Olson burned the clothes in the vacant lot. Olson maintains his innocence and contends that Black and Link set him up to be charged with the Davis murders.

C. *Link's Murder Trial Testimony.*

At her own trial, Jean Link disclaimed knowledgeable participation in the Davis murders. Link testified that James Black asked her to assist him in killing Lueberta Davis and threatened her with harm if she refused. On January 12, 1978, Black called Link and instructed her to buy two cans of gasoline. He told her to go to the Davis home, to stay overnight, and to use the gasoline to set the house on fire after Davis fell asleep. After Black hung up, a person identifying himself as "Ron" called Link, and said he would be hiding in the closet to help her. Based on the background noise, Link believed that this call also came from the jail.[8] Link went to Davis' apartment that evening, but did not take the gasoline along and left early.

Link testified that a messenger from Black came to her house the following evening, slapped her around, and told her that Black wanted no one hurt, that he simply wanted to get rid of some clothes. She described the stranger as a black man, six feet tall, with medium bushy hair.[9] In a telephone conversation with Link the following day, Black allegedly confirmed his desire to burn only the clothes.

Two days before the Davis murders Black telephoned Link and told her to go to the

5. Although Olson did not directly testify that Link drove away from the empty lot and then returned, he implied that she had done so.

6. According to other testimony produced at the trial, Olson, immediately after the fire, falsely explained the whereabouts of his missing ski jacket by stating that he had thrown his ski jacket into the fire during the destruction of Black's clothes.

7. Sandra McKenzie testified that Olson told her Black would arrange a job for him through Jean Link's father.

8. In its closing argument, the defense argued that Black had associates to help him carry out his plans to murder members of the Davis family.

9. According to Olson's theory, this stranger might fit Oppegaard's description of the person he saw running from the Davis residence when the fire erupted.

courthouse to meet Dale Olson upon his release. Link did so, and later that day, in response to a message from Black, she also visited Black at the jail. Black instructed her to pick up Olson and take him with the gasoline to Lueberta Davis' apartment. Link testified that Black threatened to kill her and her baby if she did not comply with his directions. Later that afternoon, Black called Link and gave her a telephone number where she could reach Olson.

On the evening of January 19, 1978, Link picked up Olson in her car and took him to the Davis residence. Link testified that Olson wore a ski mask on his head; however, he had not pulled the mask down over his face. Link testified that while they were parked outside the Davis apartment, Olson asked about the gasoline. After Link stated that it was in the trunk, Olson opened the trunk and left. She waited in her car with the motor running and the headlights off. Approximately thirty minutes later, Olson came running out of the house with his pant leg on fire. Olson said, "Let's go," and directed Link to drive to the Haney residence in Anoka County.

At first, Link thought Olson had thrown his jacket from the car as they drove to the Haney residence. Link later recalled that when she had stopped the car at a gasoline station to buy cigarettes, she noticed Olson standing by a fence. On resuming their trip, Olson asked to borrow Link's jacket. After her arrest, Link concluded that Olson could have discarded his ski jacket at the service station and informed police of this possibility.

The next morning Link heard a news program reporting the deaths of Lueberta Davis and her two children. She then vacuumed her car to remove the feathers that had fallen from Olson's jacket. Later that day Link called Olson. She refused a request from Olson to stay overnight at her place. Olson then asked about the $400 Black had promised. Link stated that she had no money and denied Olson's subsequent request to borrow money from her.

### D. *Link's Statements to Police.*

The state prosecutor introduced two statements that Jean Link gave to police during interrogation after her arrest. In the first statement, Link disclosed that on January 12, 1978, James Black instructed her to buy gasoline, to go to Lueberta Davis' apartment, and to use the gasoline to set the apartment on fire after Davis fell asleep. Link said that she bought two cans of gasoline and she acknowledged that she called on Davis on the evening of January 12. She stated, however, that she did not take the gasoline with her, and that she left the Davis apartment around midnight.

In the same statement, Link recounted her visit with Black at the jail on January 19. Black directed her to take Dale Olson to Davis' apartment that night. She also stated that she picked up Olson and drove to the Davis apartment that evening. Olson took the gasoline from the trunk of her car and entered the residence. Approximately thirty minutes later, Olson ran to the car. One leg of his trousers was on fire. Olson jumped into Link's car, and directed her to drive to Janine Haney's residence in Anoka County.

Link gave her second statement to the police three days after her arrest. In it, she acknowledged that she directed the police to a filling station where they recovered a partially burned jacket behind a fence. She also related that Black had threatened to kill her and her child if she did not pick up Olson and take him to the Davis apartment. In this statement, Link further related a conversation with Olson concerning $400 that Black had promised Olson to enable him to rent an apartment for himself and his girlfriend.

Link also recalled that at the Haney residence in Anoka, Olson responded to a question about the disappearance of his jacket by stating that he had gotten too close to the fire while burning Black's clothes.

## II. *Discussion.*

### A. *Confrontation Clause.*

Link made her two out-of-court statements in response to extensive police ques-

tioning. The Supreme Court of Minnesota aptly summarized the circumstances surrounding the admission of these statements into evidence:

> Despite a court order to testify at appellant's trial, Link refused to do so. The court held Link in contempt and found that she was unavailable as a witness. Following an extensive offer by the state to corroborate by means of independent witnesses and physical evidence nearly all of the important events described by Link, the court ruled that the statements and testimony were admissible under hearsay exceptions as statements against penal interest or as necessary and trustworthy statements. The [trial] judge further ruled that Olson was not denied his right to confrontation under either the theory (1) that appellant waived his right by intimidating Link to prevent her from testifying, or (2) that under the circumstances there was no confrontation right violation because Link was unavailable and her out of court statements bore indicia of reliability. [*State v. Olson, supra,* 291 N.W.2d at 205.]

The Supreme Court of Minnesota commented on the admissibility of the challenged statements:

> Absent a finding of harmless error or a finding that the defendant is precluded

from asserting his confrontation right because of his wrongdoing, the case would present a clear denial of the defendant's constitutional right to confront the witnesses against him. [*Id.* at 206.]

We agree with that observation. In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court enunciated the following rule for determining whether the admission of hearsay statements violates the confrontation clause:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness. [*Id.* at 66, 100 S.Ct. at 2539 (footnote omitted).]

We first consider whether Link's custodial statements implicating Olson in the crimes for which she was arrested fall within a firmly rooted hearsay exception. United States Supreme Court decisions [10] as well as decisions from the courts of appeals [11] indicate that custodial statements

---

**10.** *See, e.g., Dutton v. Evans,* 400 U.S. 74, 98, 91 S.Ct. 210, 224, 27 L.Ed.2d 213 (1970) (Harlan, J., concurring) (confession of accomplice resulting from formal police interrogation should not be introduced against accused as evidence of guilt); *Bruton v. United States,* 391 U.S. 123, 127–28, 88 S.Ct. 1620, 1623, 20 L.Ed.2d 476 (1968) (confession of codefendant implicating defendant not admissible in joint trial); *Douglas v. Alabama,* 380 U.S. 415, 419–20, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965) (confession of accomplice implicating accused violated confrontation clause).

**11.** Decisions from the various circuits interpreting Federal Rule of Evidence 804(b)(3), which is identical to the Minnesota rule on declarations against penal interest, indicate that statements of an accomplice implicating the accused made in response to custodial interrogation are not inherently reliable. *See United States v. Riley,* 657 F.2d 1377, 1381–85 (8th Cir. 1981); *United States v. Palumbo,* 639 F.2d 123, 127–28 (3d Cir. 1981); *United States*

*v. Sarmiento-Perez,* 633 F.2d 1092, 1102–03 (5th Cir. 1981); *United States v. Oliver,* 626 F.2d 254, 261–63 (2d Cir. 1980); *United States v. Love,* 592 F.2d 1022, 1024–26 (8th Cir. 1979); *United States v. Lilley,* 581 F.2d 182, 187–88 (8th Cir. 1978); *but see United States v. Robinson,* 635 F.2d 363, 364 (5th Cir.) (statements of accomplice while not in custody admissible against defendants under Rule 804(b)(3) and confrontation clause), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3050, 69 L.Ed.2d 419 (1981); *United States v. Garris,* 616 F.2d 626, 633 & n.16 (2d Cir.) (statement implicating accused admissible under Rule 804(b)(3), but confrontation right not implicated because declarant testified), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3021, 65 L.Ed.2d 1119 (1980).

We do not suggest that the Minnesota courts erroneously interpreted their own hearsay rules; but we cite these cases to demonstrate that statements of an accomplice or conspirator given in response to police questioning do not constitute a well-recognized exception to the hearsay rules.

implicating a third person do not fall within a firmly rooted hearsay exception. Thus, although Link's statements may have qualified for admission under Minnesota's penal interest exception to the hearsay rule,[12] this alone does not guarantee a sufficient degree of reliability for confrontation clause purposes. Moreover, Link's statements to police do not carry the particularized guarantees of trustworthiness that will satisfy confrontation requirements.

In *United States v. Riley*, 657 F.2d 1377, 1384–85 (8th Cir. 1981), this court ruled that an accomplice's custodial statement implicating the defendant, although ostensibly against the declarant's interest, did not qualify for admission under Fed.R.Evid. 804(b)(3) because the circumstances did not clearly indicate the trustworthiness of the statement. Similarly, in *United States v. Love*, 592 F.2d 1022, 1026 (8th Cir. 1979), we noted the inherent unreliability of custodial statements implicating a third person when we observed that "a strong incentive to speak, whether it be truthfully or falsely * * * does not indicate sufficient reliability to bring the statement within the [penal interest] exception to the hearsay rule."

The Advisory Committee Notes to Federal Rule of Evidence 804(b)(3) also caution against admissibility of such custodial statements: "[A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest." Fed.R.Evid. 804, Notes of Advisory Committee on Proposed Rules. Justice White similarly noted the inherent unreliability of such statements when he observed:

Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence. Whereas, the defendant's own confession pos-

sesses greater reliability and evidentiary value than ordinary hearsay, the codefendant's confession implicating the defendant is intrinsically much less reliable.

\* \* \* \* \* \*

[T]he codefendant's admissions cannot enter into the determination of the defendant's guilt or innocence because they are unreliable. [*Bruton v. United States, supra*, 391 U.S. 123 at 141–42, 88 S.Ct. 1620 at 1630–31, 20 L.Ed.2d 476 (White, J., dissenting).]

We conclude, therefore, that Link's statements to police do not bear sufficient "indicia of reliability" to satisfy the requirements of the confrontation clause. *See Ohio v. Roberts, supra*, 448 U.S. at 66, 100 S.Ct. at 2539; notes 10 & 11 *supra*.

B. *Waiver.*

The Minnesota Supreme Court held that Olson waived his confrontation right because James Black's threats against Link could be imputed to Olson "insofar as he was acting as a co-conspirator to destroy evidence against Black[.]" *State v. Olson, supra*, 291 N.W.2d at 208.

In reviewing Olson's petition for a writ of habeas corpus, the federal district court also held that Olson waived his confrontation right:

Since clear and convincing evidence demonstrates Dale Olson's involvement in a conspiracy to murder the Davises, the public interest requires that the acts of co-conspirator James Black which prevented Jean Link from testifying about the murders, and which apparently were undertaken by Mr. Black on behalf of both Mr. Olson and himself, result in a waiver of Mr. Olson's right to confront Ms. Link. The State's legitimate interests in preventing Dale Olson from benefitting from Mr. Black's actions and in deterring similar actions by co-conspira-

---

12. The trial court admitted Link's statements to the police under the penal interest exception of the Minnesota Rules of Evidence. *See* Minn.R. Evid. 804(b)(3). While a state court's interpretation of its own rules of evidence is binding upon this court, whether the statements at is-

sue fall within a "firmly rooted" hearsay exception implicates matters of constitutional magnitude under the confrontation clause that are cognizable in this court. *See California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970).

tors in the future "warrant dispensing with" Mr. Olson's confrontation right. *See Ohio v. Roberts, supra,* 100 S.Ct., at 2538. Accordingly, for this additional reason there was no constitutional error in the admission into evidence of Ms. Link's statements to police. [528 F.Supp. at 32 (footnotes omitted).]

We disagree and determine that Olson did not waive his confrontation right.

■ In *United States v. Carlson,* 547 F.2d 1346, 1357–60 (8th Cir. 1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), this court held that a defendant who procures the absence of a potential witness cannot complain that he was denied the right of confrontation when the absent witness' hearsay statements are admitted against him at trial. The government witness in *Carlson* refused to testify after intimating to government agents that the defendant had threatened him with physical harm. *Id.* at 1352–53. The district court conducted a hearing and found that the defendant had indeed made the witness unavailable for trial. *Id.* at 1353. Because the sixth amendment does not stand as a shield to protect a criminal defendant from his own misconduct or chicanery, the defendant's coercion resulted in a voluntary waiver of his right of confrontation. *Id.* at 1359–60.[13]

In the present case the state trial judge held an evidentiary hearing to determine the admissibility of Link's statements to the police after Link refused to testify at Olson's trial. Although the record contains evidence of threats against Link by Black and others, virtually no evidence ties Olson to these threats.[14] Link testified at the evidentiary hearing that Olson had not induced her fear of testifying at his trial. Indeed, the state trial judge stated that he took "at face value Dale Olson's present denial of making any threats."[15]

■ The right to confront witnesses is a constitutional right personal to the accused. *United States v. Carlson, supra,* 547 F.2d at 1357. Only Dale Olson or someone acting on his behalf may waive or forfeit that right. *See United States v. Mayes,* 512 F.2d 637, 650–51 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975). The State has not established that Black acted on Olson's behalf or that they acted together to procure Link's silence. Therefore, Black's conduct intimidating Link into silence may not be attributed to Olson to effect a waiver of Olson's right to confront Link.

The Minnesota Supreme Court suggested that the murders themselves might provide a basis for waiver of Olson's confrontation right. According to that court, "[t]he very fact of the Davis murders constituted a threat to Link[,]" because Lueberta Davis was, like Link herself, a potential witness against Black. *State v. Olson, supra,* 291 N.W.2d at 207. Olson's involvement in the Davis murders, however, was itself the issue at trial and Olson's unlawful acts were directed at third persons, not Link.

13. We applied this principle in holding that James Black's threats against Jean Link resulted in a waiver of Black's confrontation right in his trial for these same murders. *See Black v. Woods,* 651 F.2d 528, 531 (8th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 164, 70 L.Ed.2d 134 (1981).

14. The only independent evidence linking Olson to Link's fear of testifying came from Minneapolis Police Detective William Nelson. Detective Nelson testified that when plain clothes officers arrested Link on January 20, she stated that she first thought the officers were Olson or some of his friends coming to kill her.

15. In ruling that Olson had waived his confrontation right, the trial judge relied in part on Link's former testimony and her statements to the police. The trial judge implied that this evidence served to establish a conspiracy between Olson and Black. The judge then determined that because the declarations or actions of one conspirator can be shown against the other, Black's intimidation of Link could be imputed to Olson to effect a waiver of Olson's confrontation right. A court, however, may not rely on the evidence, the admissibility of which is itself in issue to resolve the question of waiver. *Cf. United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir. 1978) (determination of admissibility of co-conspirator's statement must be based on evidence independent of the statement).

■ None of the cases cited to us by the State supports the proposition that a defendant waives the right to confront adverse witnesses by participation in the commission of the crime. Predicating a waiver of the confrontation right on such a basis would destroy the right of confrontation in many cases. *See United States v. Benfield*, 593 F.2d 815, 821 (8th Cir. 1979). Involvement in the crime itself can form the basis for waiver only if the evidence indicates that the defendant directed the crime against the witness or otherwise procured the witness' absence.

Assuming, *arguendo*, that the murders at issue could provide the basis for a finding of waiver, those crimes would do so only as to Black. While the crime against the Davis family may have demonstrated Black's propensity and ability to silence witnesses against himself even while imprisoned, it does not demonstrate that Olson possessed a similar propensity or ability. Moreover, the evidence indicates that Link's fear of testifying did not emanate from Olson, but from Black, who then had not been tried.[16]

Rejecting waiver as a basis for admissibility of the challenged statements, we now examine whether the admission of the statements in the circumstances of this case constituted harmless error.

C. *Harmless Error.*

The mere finding of a violation of the confrontation clause does not require reversal of a criminal conviction if "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). Thus, on the basis of our own reading of the record, we assess the probable impact of the statements on the jury to determine whether admission of Link's statements to the police sufficiently prejudiced Olson to require a reversal. *Id.* at 432, 92 S.Ct. at 1059; *see Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We conclude that the admission of those statements in the context of the whole case constituted harmless error.

We initially determine whether the portions of Link's trial testimony that Olson introduced may be considered in deciding whether admission of Link's statements to the police constituted harmless error.

■ We note that the federal district court concluded that Link's statements to the police were substantially similar to the properly admitted testimony from her murder trial, and therefore any error in admitting Link's statements was harmless beyond a reasonable doubt. On this appeal, Olson contends that he introduced Link's trial testimony to mitigate the effect of the trial court's improper admission of her custodial statements. He asserts that he would not have introduced Link's trial testimony, if the state trial court had not admitted her statements to the police. Olson maintains, therefore, that Link's trial testimony should not be considered in determining whether the error in admitting the custodial statements was harmless.

■ The record, however, belies Olson's contention. Only the introduction of Link's trial testimony could support Olson's alibi, at least in part. Olson relied on Link's testimony recounting Black's intention to burn only clothes and describing an unidentified black man with bushy hair as Black's accomplice. These portions of Link's testimony bolstered Olson's theory that an uni-

---

16. We note that the Minnesota Supreme Court recently rejected a trial court's finding of waiver based on the witness' fear of testifying. *State v. Hansen*, 312 N.W.2d 96 (Minn.1981). The court reasoned:

Since the state did not show that there was any direct or indirect evidence indicating that defendant's conduct had caused the [witnesses'] silence, we are compelled to conclude that the trial court erred in determining that defendant had waived his constitutionally guaranteed right of confrontation. [*Id.*, at 105 (footnote omitted).]

dentified person carried out the murders as an accomplice of Black and Link while Olson burned the clothes in a vacant lot. According to this theory, Black and Link then tried to frame Olson for the murders of Lueberta Davis and her children.[17]

Our review of the record indicates that Olson introduced Link's trial testimony for the affirmative purpose of supporting his alibi theory, and not merely in an attempt to mitigate the erroneous admission of Link's statements to the police.[18] We reject Olson's contention that this court should not consider Link's trial testimony in determining whether admission of Link's custodial statements constituted harmless error.

The State established a strong case against Olson apart from Link's statements to the police. The trail of partially burned feathers matching those from Olson's jacket, which led from the Davis residence to the spot where Curtis Oppegaard observed the man get into the yellow Volkswagen, pointed to Olson as the person responsible for carrying out Black's instructions to kill Lueberta Davis and her two children. Considering the time of night, Olson's beard, and the likelihood that the flames might have seared the arsonist's face, Oppegaard's initial account of a black man running to the car did not necessarily exclude Olson as a suspect. Olson himself admitted that he was in the Davis apartment on the night of the murders. In Link's trial testimony, she stated that she saw Olson running from the house to the car and described the leg of his pants as being on fire. This evidence overwhelmingly implicated Olson in the crimes.

By contrast, Olson's alibi testimony lacked credibility in light of the other evidence. He testified that he burned clothing in a vacant lot. His description of the location of the lot proved inconsistent with the traffic patterns of the one-way streets Link would have had to have driven to reach it. Olson's own investigator could find no traces of a fire at any vacant lot in the vicinity of the Davis residence. The trail of partially burned feathers from Olson's jacket, leading from the Davis apartment to where Oppegaard testified the yellow Volkswagen had been parked, strongly refutes Olson's alibi testimony. Finally, Olson's explanation for his activities as "burning clothes" was shown to be suspect from the very beginning by his false explanation that he threw his ski jacket into the fire while burning Black's clothing. *See* note 6 *supra.*

As presented, the jury was given the choice of deciding whether Olson ignited the fire in the Davis apartment or some unknown stranger committed that crime. The evidence properly admitted at the trial overwhelmingly demonstrated Olson's guilt. On this record, the case against Olson, without Link's statements to the police, would not have been significantly less persuasive to the jury. We hold the error of admitting Link's statements harmless. Accordingly, we affirm the district court's order denying Olson's petition for a writ of habeas corpus.

---

17. Olson's counsel in final argument theorized:
    And the facts in this case demonstrate circumstances which undeniably are consistent with a set-up, a set-up which Mr. Anderson [prosecutor] derided. That set-up may sound vague, but, ladies and gentlemen, there's a lot of strange things about this case. There's a lot of strange motivations in this case.
    It appears that at 3043 Second Avenue South where Jean Link took Dale Olson that she was there twice on that night, once with Dale Olson and one other time with a black man with a white sweater.

18. The use of Link's trial testimony for the affirmative purpose of bolstering the defense theory of the case distinguishes this case from *United States v. Straughan,* 453 F.2d 422 (8th

Cir. 1972). In *Straughan,* this court noted that the Government could not cure the prejudice of erroneously admitted testimony by relying on testimony that the defense elicited on cross-examination in an attempt to mitigate the effect of the prior erroneous ruling. *Id.* at 428. *See also United States v. Rios,* 611 F.2d 1335, 1339 n.4 (10th Cir. 1979), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981); *United States v. Heffner,* 420 F.2d 809, 813–14 (4th Cir. 1970); *cf. Harrison v. United States,* 392 U.S. 219, 224–25, 88 S.Ct. 2008, 2011, 20 L.Ed.2d 1047 (1968) (defendant's trial testimony inadmissible in retrial unless Government demonstrates that introduction of illegally obtained confession in first trial did not induce defendant's testimony).